UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DUBRAVKA JURAGA, | ) | |
|        Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| | ) | |
|        v. | ) | Case No: 1:16-cv-04270 |
| MTGLQ INVESTORS, L.P.; OCWEN LOAN SERVICING, LLC; and NEW PENN FINANCIAL, LLC d/b/a SHELLPOINT MORTGAGE SERVICING, | ) ) ) ) ) | JURY TRIAL DEMANDED |
|        Defendants. | ) | |

## COMPLAINT

Plaintiff DUBRAVKA JURAGA, by the undersigned attorneys, brings this complaint against Defendants MTGLQ INVESTORS, L.P., OCWEN LOAN SERVICING, LLC, and NEW PENN FINANCIAL, LLC d/b/a SHELLPOINT MORTGAGE SERVICING as follows:

### NATURE OF THE ACTION

1. Plaintiff Dubravka Juraga brings this action for damages for breach of contract, violations of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), and violations of the Fair Debt Collection Practices Act ("FDCPA").

2. All of the claims stated herein stem from Defendants' wrongful servicing and debt collection activities related to Juraga's home mortgage loan.

1

## JURISDICTION AND VENUE

3. Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. § 1692k (FDCPA), as the action arises under the laws of the United States. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391 as the subject property is in this District and the events occurred in this District.

## PARTIES

5. Plaintiff Dubravka Juraga ("Juraga") is a natural person who owns the property at 4012 N. Park St., Westmont, IL 60559 ("subject property"). Juraga purchased the subject property as her primary residence and continues to occupy it as her primary residence.

6. Defendant MTGLQ Investors, L.P. ("MTGLQ") is a foreign corporation and a creditor, debt collector, and investor of mortgage loans.

7. MTGLQ is the current creditor of the subject loan.

8. Defendant OCWEN LOAN SERVICING, LLC ("Ocwen") is a Florida company with its principal place of business in Florida. Ocwen acts as a debt collector and servicer of mortgage loans across the country, including in the state of Illinois.

9. Defendant New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") is a Delaware company with its principal place of business in Pennsylvania. Shellpoint acts as a debt collector and servicer of mortgage loans across the country, including in the state of Illinois.

### FACTS SUPPORTING THE CAUSES OF ACTION

10. On October 19, 2006, Juraga executed a $25,500.00 mortgage loan with Green Point Mortgage. The loan was secured as a second mortgage on the subject property and was used to purchase Juraga's family home (hereinafter "subject loan").

11. The subject loan was an interest only loan, had a 30-year term, and required monthly payments of $228.44.

12. Due to a financial setback in 2007, Juraga defaulted on the subject loan.

13. The first lien mortgage on the subject property is also currently serviced by Defendant Ocwen. This first lien mortgage is not the subject of this litigation.

    a. **Juraga's Chapter 13 Bankruptcy Repayment Plan**

14. On March 8, 2008, Juraga filed a chapter 13 bankruptcy petition in the Northern District of Illinois, case number 08 B 30501. Schedule D of the bankruptcy petition listed the subject loan as a secured pre-petition debt owed to SLS. SLS was the loan servicer at that time.

15. Juraga's chapter 13 bankruptcy included a repayment plan, whereby Juraga would make monthly payments to the bankruptcy trustee over 60 months in order to cure any defaulted debts.

16. Specifically, Juraga's repayment plan proposed to repay the subject loan arrears (approximately $2,600) by making regular payments to the chapter 13 trustee over 60 months.

17. The plan further provided that Juraga would make current monthly payments on the subject loan directly to SLS in the amount of $230.00.[1]

18. On November 11, 2008, Defendant MTGLQ filed a proof of claim in Juraga's bankruptcy as the owner of the subject loan. MTGLQ's proof of claim directed Juraga to send her current monthly payments directly to MTGLQ.

---

[1] This was $1.56 more than the required $228.44 monthly payment on the subject loan.

19. On January 7, 2009, Juraga filed a modified chapter 13 plan. The treatment of the subject loan was unchanged, whereby Juraga would cure all prepetition arrearages through payments to the chapter 13 trustee and make current payments directly to MTGLQ.

20. On January 13, 2009, the Honorable Judge Squires confirmed the modified plan by court order.

21. No party filed any objection to the plan regarding the treatment of the subject loan.

22. On January 15, 2009, Juraga began sending her current monthly payments to MTGLQ. Juraga also made all of her payments to the chapter 13 trustee as required each month.

    b.   **Transfer to Ocwen**

23. On October 11, 2011, Defendant Ocwen filed a notice of transfer of servicing of the subject loan with the bankruptcy court, directing Juraga to make current payments to Ocwen instead of MTGLQ. *See* Exhibit A attached hereto is the notice of transfer.

24. Thereafter, Juraga began making her current monthly payments to Ocwen.

25. On December 14, 2011, the chapter 13 trustee sent a notice of final mortgage cure to Ocwen following the transfer. The notice from the trustee specifically set forth:

> The notice must be filed with the court within sixty (60) days...of the service of the notice of cure from the Trustee and the notice shall be served to the debtor, the debtor's attorney, and the standing trustee. If the mortgage holder fails to file and serve a statement of outstanding obligations within the required time, the holder is then required to treat the mortgage as reinstated according to the original terms and fully current as of the date of the trustee's notice.

*See* Exhibit B attached hereto is the December 14, 2011 notice of mortgage cure.

26. Ocwen never filed nor served any statement of outstanding obligations.

27. However, outside of the bankruptcy proceeding, Ocwen did not acknowledge the terms of the confirmed plan, Juraga's payments to the trustee, or Juraga's current payments made directly to Ocwen and the previous owners/servicers of the subject loan.

4

28. Ocwen began sending Juraga conflicting correspondence that ignored the confirmed bankruptcy plan. Ocwen claimed that Juraga was substantially in default on the subject loan and due for the December 1, 2008 payment. For example, in June 2012, Ocwen claimed that Juraga owed a total balance of over $31,500.00, which was $6,000.00 more than the original balance.

29. Juraga continued to make all of her required payments to the chapter 13 trustee and also all of her payments to Ocwen. Ocwen accepted Juraga's payments, but did not correct the account to acknowledge the confirmed bankruptcy plan.

30. Many of Juraga's current payments were in excess of the $230 owed each month.

31. On both July 25, 2012 and August 27, 2012, Ocwen sent Juraga notices stating that the subject loan had been "charged off" and that she had been released from liability.

32. Juraga called Ocwen for clarification. In September 2012, an Ocwen representative advised Juraga that Ocwen had applied Juraga's current monthly payments for the subject loan to Juraga's first mortgage loan account instead (which was also serviced by Ocwen). Other than acknowledging the error, Ocwen did not correct the account or provide any explanation.

33. On November 13, 2012, Juraga sent a dispute letter to Ocwen, requesting help with the subject loan and an explanation of the previous correspondences. *See* Exhibit C attached hereto is the November 13, 2012 dispute letter.

34. On December 12, 2012, Ocwen responded by stating that the subject loan was "incorrectly transferred to Ocwen by Litton," and that Ocwen would delete the tradeline from Juraga's credit reports. *See* Exhibit D attached hereto is the December 12, 2012 response letter.

35. This response did not provide any answers to her questions and Juraga did not understand why the subject loan was treated as both severely in default (in contravention of the bankruptcy plan) and also as "charged off" without any remaining liability.

36. Similar conduct continued for two years through the end of the bankruptcy case, where Ocwen would not acknowledge the confirmed bankruptcy plan, improperly held Juraga in "default," and would not respond to Juraga's disputes or correct the account.

37. In January 2013, to add to the confusion, Ocwen sent Juraga a notice that it was servicing the subject loan with an account number ending in 045. Since Ocwen became the servicer in October 2011, the subject loan account number ended in 665.[2]

38. In November 2013, Juraga completed her chapter 13 plan by making all required payments to the trustee. All prepetition arrearages on the subject loan were fully cured.

39. On November 15, 2013, the bankruptcy trustee issued a "Notice of Payment of Final Mortgage Cure" to Ocwen and MTGLQ, allowing 21 days to file a statement identifying any prepetition or post-petition amounts that were unpaid by Juraga. *See* Exhibit E attached hereto is the November 15, 2013 notice of final mortgage cure.

40. Neither Ocwen, MTGLQ, nor any other party ever filed any statement or other document that set forth any amounts that were unpaid by Juraga on the subject loan. By operation of law, the subject loan was deemed current.

41. On December 12, 2013 – without explanation – Ocwen sent Juraga a letter stating that Ocwen became the servicer of the subject loan beginning on November 1, 2013. Ocwen previously filed a notice with the bankruptcy court stating that it became the servicer in October 2011. *See* Exhibit A. Juraga had been sending payments to Ocwen since November 2011.

42. On January 21, 2014, the bankruptcy trustee filed a final report confirming that Juraga had made all of her required plan payments. Juraga's bankruptcy case was closed.

---

[2] The first position mortgage loan number that was also serviced by Ocwen did not end in either 045 or 665.

    **c. Post-Bankruptcy Conduct**

43. On March 4, 2014, Juraga sent another dispute letter to Ocwen requesting information related to the status of the subject loan and clarification as to what happened to all of her payments. Juraga attached a spreadsheet listing all of her payments made on the subject loan.

44. On April 14, 2014, Ocwen responded by stating that Ocwen acquired the servicing rights to the loan on November 1, 2013 and that the loan was discharged in bankruptcy. Once again, this response did not address any of Juraga's questions or correct the account.

45. On May 9, 2014, Juraga sent Ocwen another dispute letter and attached proof of approximately $16,000.00 in payments made on the subject loan that were not applied to her account.

46. On June 6, 2014, Ocwen responded by stating, "Our records indicate that, your concerns have been addressed in our research response letter dated December 12, 2012." *See* Exhibit F attached hereto is the June 2014 response letter.

47. Once again, this response did not provide any answers or corrections to her account. Ocwen's December 12, 2012 letter simply stated that the subject loan was "incorrectly transferred to Ocwen by Litton." *See* Exhibit D.

48. Instead of answering Juraga's questions or correcting the account, Ocwen sold servicing rights to the subject loan to Defendant Shellpoint on July 22, 2015.

49. Upon the transfer to Shellpoint, Ocwen falsely claimed that the loan was over $9,000.00 delinquent and was due for the December 2007 monthly installment.

7

### d. Transfer to Shellpoint

50. On July 28, 2015, Shellpoint sent Juraga a notice of transfer of servicing from Ocwen to Shellpoint with an effective date of July 22, 2015. The notice claimed that Juraga was due for the December 1, 2007 monthly payment. The notice also stated that Goldman Sachs was the owner of the loan. *See* Exhibit G attached hereto is the July 28, 2015 notice of transfer.

51. On July 29, 2015, Shellpoint sent Juraga a debt validation notice stating that Juraga immediately owed $9,198.74 (past due) and owed a total principal balance of $25,351.74. Juraga received Shellpoint's debt validation notice on August 3, 2015. *See* Exhibit H attached hereto is the July 29, 2015 debt validation letter.

52. On September 1, 2015, Juraga, through the undersigned attorneys, sent an FCPA dispute letter to Shellpoint. The letter specifically disputed the handling of the account and stated:

> Juraga cured all arrearages on the subject debt, bringing the loan fully current, through a chapter 13 bankruptcy case that was filed in 2008. As such, the "December 1, 2007 due date," the current balance of "$9,198.74," and the total principal balance of "$25,351.74" are grossly inaccurate and do not reflect or account for all of Juraga's payments made after December 1, 2007.

*See* Exhibit I attached hereto is the September 1, 2015 dispute letter.

53. Juraga's letter also included a request pursuant to TILA § 1641(f)(2) for the identity of the current owner and creditor of the subject debt, and the date they acquired the debt. *Id*.

54. On October 20, 2015, Shellpoint responded to Juraga's dispute letter. Shellpoint falsely stated that Juraga owed for the December 1, 2007 monthly installment, yet acknowledged Juraga's bankruptcy. *See* Exhibit J attached hereto is the October 20, 2015 response letter.

55. The letter also stated that Defendant MTGLQ was the current owner of loan, even though Shellpoint stated that Goldman Sachs was the owner on July 28, 2015. *See* Exhibits G and J.

56. In its letter, Shellpoint did state that it would request the loan history from the previous servicer and conduct a review. However, Shellpoint never followed up on the matter or otherwise responded substantively to Juraga's dispute or correct the account.

57. As of the date of this complaint, Shellpoint continues to claim that Juraga is approximately $9,000 in arrears and due for the December 2007 monthly installment.

## CAUSES OF ACTION

### a. Agency

58. MTGLQ, as the creditor of the subject loan, had a consensual agency relationship with Ocwen and Shellpoint as its loan servicers. MTGLQ (as the principal) had the right to control and direct the activities of Ocwen and Shellpoint (as the agents), and Ocwen and Shellpoint had the authority to act on behalf of MTGLQ.

59. MTGLQ, as the principal, is liable for the acts and omissions of Ocwen and Shellpoint related to the subject mortgage loan account.

### b. Damages

60. Juraga obtained the subject loan in October 2006 in the amount of $25,500.00, with required monthly payments of interest in the amount of approximately $230.00.

61. In January 2014, upon completion of the chapter 13 bankruptcy plan, Juraga was deemed contractually current by operation of law.

62. Additionally, Juraga often made monthly payments in excess of the $230 owed to pay down the principal balance.

63. However, both Ocwen and Shellpoint continued to attempt to collect upon the subject loan as if virtually no payments had been made for seven years, and as if nearly the entire principal balance remained due and owing.

9

64. As of July 28, 2015, Shellpoint claimed that Juraga owed a principal balance of $25,351.74 – or $148.26 less than the original balance in 2006 – and was due for the December 2007 monthly installment.

65. In the face of repeated disputes over several years, neither Ocwen nor Shellpoint took any action to correct the account or deal honestly with Juraga. This needlessly caused Juraga an extreme amount of stress as it jeopardized the safety of her family home. Juraga has suffered damages proximately caused by Ocwen's and Shellpoint's conduct, including:

   i. Never receiving the benefit of her payments made to the bankruptcy trustee or payments made directly to the loan servicers outside of bankruptcy;
   ii. Improper fees, charges, and interest being assessed to the loan account;
   iii. Postage and payment fees;
   iv. Having to pay an inflated principal balance;
   v. Expenditure of time and money;
   vi. Emotional distress and anxiety; and
   vii. Having to hire attorneys to combat the improper debt collection.

66. By the time Juraga realized that she would not receive the benefits of her chapter 13 bankruptcy, she had fewer options than when she began the process.

## COUNT I – BREACH OF CONTRACT
### (AGAINST MTGLQ, OCWEN, AND SHELLPOINT)

67. Juraga restates and realleges paragraphs 1 through 66 as if stated herein.

68. Juraga has a valid and enforceable mortgage loan contract with MTGLQ as the creditor, and Ocwen and Shellpoint as the loan servicers.

69. At the conclusion of Juraga's bankruptcy, the subject loan was contractually current.

70. Juraga fully performed her duties by tendering her monthly payments and by complying with all other terms of the subject loan.

71. MTGLQ and Ocwen were required to properly credit payments received from Juraga.

72. MTGLQ and Ocwen were required to honor the terms of the confirmed bankruptcy plan and all bankruptcy orders with respect to the amounts due.

73. MTGLQ and Ocwen misapplied Juraga's payments from at least 2008 to the present.

74. MTGLQ and Ocwen improperly assessed penalties, deemed Juraga in default, and recorded her loan as past due. Juraga requested that Ocwen properly apply her payments, but her oral and written requests were refused.

75. MTGLQ and Ocwen are in further material breach of contract for their:

    a. failure to credit and apply Juraga's payments as required;

    b. assessment of unauthorized late fees, interest, charges, and costs;

    c. failure to correct the account after repeated disputes; and

    d. failure to conduct their affairs in good faith.

76. As the assignee to the contract, Shellpoint is liable for the acts of the assignor, as Shellpoint simply continued Ocwen's practices of ignoring Juraga's true payment history and the confirmed bankruptcy plan, and treating Juraga as if she were in "default."

77. Additionally, Shellpoint refused to correct the loan account after being provided a clear and unambiguous dispute from Juraga.

78. Juraga suffered damages as set forth in paragraphs 65 and 66 that were proximately caused by the breach of contract.

    WHEREFORE, Plaintiff Dubravka Juraga requests that this Honorable Court:

    a. enter judgment in her favor and against MTGLQ, Ocwen, and Shellpoint;

    b. find that MTGLQ, Ocwen, and Shellpoint materially breached the contract;

    c. award Juraga her actual damages to be proven at trial; and

    d. award Juraga any other relief this Honorable Court deems equitable and just.

### COUNT II – VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT
### (AGAINST MTGLQ AND OCWEN)

79. Juraga restates and realleges paragraphs 1 through 78 as if stated herein.

80. Juraga meets the ICFA definition of "consumer" and "person." *See* 810 ILCS 505/1.

81. MTGLQ and Ocwen violated 815 ILCS 505/2 by employing unfair and deceptive acts and practices when dealing with Juraga. The unfair and deceptive acts and practices complained of occurred in the course of conduct involving trade or commerce.

#### a. Unfair and Deceptive Acts

82. Ocwen made outright false statements of fact to Juraga as to the status of her loan account, the amounts owed, how payments would be applied, and what Juraga *should* do with her payments as set forth in Ocwen's own court filings. *See* Exhibit A.

83. In October 2011, Ocwen filed its transfer of claim in the bankruptcy case – under the penalties of perjury – asserting a right to current and direct payments from Juraga. *Id*

84. It was unfair and deceptive for Ocwen to then act as if the Honorable Judge Squires' confirmation order and basic tenets of bankruptcy law did not apply to Ocwen.

85. It was unfair and deceptive for Ocwen to repeatedly attempt to collect from Juraga directly prepetition arrearages that were paid to the trustee pursuant to the confirmed plan. Ocwen participated in the bankruptcy case and was provided with notice of all activity.

86. At the conclusion of the chapter 13 repayment plan, and after receiving notice from the trustee in November 2013, it was unfair and deceptive for Ocwen to refuse to treat the subject loan as contractually current. *See* Exhibit E. Ocwen continued to treat the subject loan as due for the December 2007 monthly installment.

87. Ocwen unfairly and deceptively sent Juraga conflicting correspondence, including (a) two different loan numbers for the same subject loan (X045 and X665); (b) conflicting dates as

to when Ocwen became the loan servicer (October 2011 and November 2013); and (c) notices falsely stating that her liability had been released.

88. Juraga's inquiries regarding the servicing of the subject loan were never investigated nor accurately answered by Ocwen.

89. Additionally, it was unfair and deceptive to transfer servicing rights to Shellpoint as if the loan was in default for the December 2007 monthly payment.

90. It was unfair and deceptive to transfer servicing rights to Shellpoint as if Juraga did not complete her 60-month bankruptcy plan or bring the loan fully current as of January 2014.

### b. Public Policy, Immoral Actions, and Substantial Injury to Consumers

91. Ocwen's conduct offends public policy as it demonstrates an industry-wide practice of ignoring court orders, sending conflicting statements to induce payments on amounts that are not owed, and by effectively stealing borrowers' payments – with the sole intention of maximizing profits and ultimately selling the loans to other servicers with inflated balances.

92. Ocwen's actions cause substantial injury to consumers generally because:

  i. consumers reasonably expect that creditors and loan servicers will communicate with them truthfully and accurately regarding their account and payments;
  ii. consumers reasonably expect that loan servicers will not make false representations or induce payments on false pretenses;
  iii. consumers reasonably expect that, if there is a dispute, the servicer will take honest efforts to resolve the dispute instead of misrepresenting facts or not responding altogether;
  iv. consumers reasonably expect that large corporations will honor and respect court orders and confirmed bankruptcy plans; and
  v. consumers reasonably expect that a loan servicer will not provide any successor loan servicer with false information about a borrower's account when transferring the loan.

93. Moreover, consumers who file for bankruptcy protection reasonably expect that the creditors and loan servicers will honor final court orders and payments made to the trustee.

94. Juraga could not avoid these immoral undertakings because Ocwen would not accurately communicate with her. Instead, Ocwen simply sold the loan with inaccurate account information to Shellpoint without investigating her disputes.

95. When taken as a whole over several years, Ocwen's conduct was so unethical and unending that Juraga had no choice but to submit. Juraga had no actual control over (a) how her payments were treated; (b) how Ocwen truly treated the loan internally; (c) whether Ocwen's representations were truthful; (d) Ocwen's sale of the loan to an unknown party; or (e) what information Ocwen provided to Shellpoint as part of the servicing transfer, knowing Shellpoint would rely upon it.

96. This conduct is part of a pattern and practice of behavior in which Ocwen routinely engages as part of its business model. It is Ocwen's normal business practice to disregard existing agreements and state and federal law, then misstate the nature of outstanding "debts" and amounts "owed" to consumers for its own pecuniary gain.

    c. **Intent, Reliance, and Punitive Damages**

97. Ocwen's communications were purposely confusing, misleading, and designed to trick Juraga into making payments, while forcing Juraga into a position where she could not decipher the true statements from the false statements.

98. Ocwen's conduct was willful, malicious, unfair, and arbitrary. It was designed to place Juraga's account in a perpetual state of "default" and take advantage of a vulnerable and unsophisticated consumer.

99. Ocwen intended that Juraga rely upon its unfair and deceptive practices to induce Juraga

into making monthly payments on amounts that she did not owe, then sell the loan to Shellpoint in "default" status for a profit.

100. Juraga did, in fact, rely upon Ocwen's unfair and deceptive practices by (a) making payments that were not credited to her account; (b) paying the amounts to Ocwen as required, while being assessed fees and charges; and (c) actually believing that she may be in substantial "default" and fearing a foreclosure lawsuit against her home.

101. On one hand, Ocwen filed its transfer of claim in the bankruptcy case – under the penalties of perjury – asserting a right to direct payments from Juraga. On the other hand, Ocwen entirely ignored the terms of the confirmed plan after inducing the payments on false pretenses.

102. Ocwen forced Juraga into a perpetual state of confusion, depriving Juraga of a peaceful existence.

103. An award of punitive damages is appropriate because Ocwen's conduct was outrageous, willful, and wanton, and showed a reckless disregard for the rights of Juraga for a nearly three-year period. Additionally, when Juraga objected, Ocwen attempted to silence her by simply selling the subject loan in "default" status to Shellpoint.

104. Juraga suffered damages as set forth in paragraphs 65 and 66 that were proximately caused by the conduct of MTGLQ and Ocwen.

> WHEREFORE, Plaintiff Dubravka Juraga requests that this Honorable Court:
> 
> a. enter judgment in Juraga's favor and against MTGLQ and Ocwen;
> b. award Juraga actual and punitive damages in an amount to be determined at trial for the underlying ICFA violations;
> c. award Juraga costs and reasonable attorney's fees as provided under 815 ILCS 505/10a(c); and
> d. award any other relief as this Honorable Court deems just and appropriate.

### COUNT III – VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
### (AGAINST OCWEN AND SHELLPOINT)

105. Juraga restates and realleges paragraphs 1 through 104 as if stated herein.

106. Juraga is a consumer under 15 U.S.C. § 1692a(3), as the subject loan was extended on Juraga's primary residence and was strictly for personal, family, and household purposes.

### AGAINST OCWEN

107. Ocwen qualifies as a "debt collector" as defined by § 1692a(6) because it regularly collects debts and uses the mail and/or the telephones to collect delinquent consumer accounts.

108. Ocwen qualifies as a "debt collector" because the principal purpose of its business is to collect debts, and because it regularly collects or attempts to collect debts owed to another party.

109. Ocwen qualifies as a "debt collector" because it acquired the subject loan after it was in default and treated the subject loan as in default when it acquired rights to the subject loan.

    **a.** **Violation of §§ 1692e, e(2), e(5), e(8) & e(10)**

110. Ocwen engaged in false, deceptive, and misleading conduct by:

   i. Utilizing false, deceptive, and misleading communications to trick Juraga into paying amounts that she did not owe, and to trick Juraga into believing that her loan was not contractually current after completion of her chapter 13 bankruptcy (§§ 1692e, e(2), & e(10));

   ii. Falsely representing the character, amount, and legal stats of the debt, and falsely claiming that Juraga owed amounts that had been paid through the bankruptcy (§§ 1692e(2) & e(10));

   iii. Attempting to collect amounts directly from Juraga – in contravention of the confirmed and completed plan – that could not legally be collected (§ 1692e(5)); and

   iv. Communicating false information to the credit bureaus and to Shellpoint that Ocwen knew to be false, and the failure to communicate that the subject loan was in dispute (§§ 1692e(8) & 1692e(10)).

    **b.** **Violation of §§ 1692f & f(1)**

111. Ocwen employed unfair and unconscionable means to collect the subject loan by:

    i. Repeatedly attempting to collect amounts from Juraga, when collection of those amounts was not expressly authorized by contract or law; and

    ii. Repeatedly attempting to collect amounts in direct violation of bankruptcy law.

112. Additionally, Ocwen violated §§ 1692e & f through its (i) unethical mismanagement of the loan account; (ii) refusal to accurately respond to Juraga's disputes; (iii) refusal to acknowledge the express terms of the confirmed bankruptcy plan; and (iv) misrepresentations of the legal status of the subject loan, including in connection with the transfer to Shellpoint.

113. The actions in paragraphs 110 through 112 were in furtherance of debt collection.

### AGAINST SHELLPOINT

114. Shellpoint qualifies as a "debt collector" as defined by § 1692a(6) because it regularly collects debts and uses the mail and/or the telephones to collect delinquent consumer accounts.

115. Shelpoint qualifies as a "debt collector" because the principal purpose of its business is debt collection, and because it regularly attempts to collect debts owed to another party.

116. Shellpoint qualifies as a "debt collector" because it acquired the subject loan after a purported default and treated the subject loan as in default when it acquired servicing rights.

    **a.** **Violation of §§ 1692e, e(2), e(5), & e(10)**

117. Shellpoint engaged in false, deceptive, or misleading conduct by:

    i. Utilizing false, deceptive, and misleading communications to deceive Juraga into paying amounts that she did not owe (§§ 1692e, e(2), & e(10));

    ii. Falsely representing the amount of the debt and a "due date" of "December 1, 2007" in its July 28, July 29, and October 20, 2015 correspondence to Juraga (§§ 1692e, e(2) & e(10));

    iii. Attempting to collect amounts from Juraga – in contravention of the confirmed and completed bankruptcy plan – that could not legally be collected (§ 1692e(5));

    iv. Falsely claiming that both Goldman Sachs and MTGLQ were the creditors of the subject loan (§ 1692e(10)).

    **b.    Violation of §§ 1692f & f(1)**

118.  Shellpoint employed unfair or unconscionable means to collect the subject loan by:

    i.    Repeatedly attempting to collect amounts from Juraga, when collection of those amounts was not expressly authorized by contract or law; and

    ii.    Repeatedly attempting to collect amounts in direct violation of bankruptcy law.

119.  All of the acts described in paragraphs 117 and 118 were in furtherance of debt collection and were not permitted by law or contract.

120.  Juraga suffered damages as set forth in paragraphs 65 and 66 that were proximately caused by Ocwen's and Shellpoint's conduct in violation of the FDCPA.

    WHEREFORE, Plaintiff Dubravka Juraga requests that this Honorable Court:

    a.    enter judgment in her favor and against Ocwen and Shellpoint;

    b.    award Juraga statutory and actual damages, in an amount to be determined at trial;

    c.    award Juraga costs and reasonable attorney's fees as provided under 15 U.S.C. § 1692k; and

    d.    award any other relief as this Honorable Court deems just and appropriate.

**Plaintiff Demands Trial by Jury.**

    Respectfully Submitted,

    By: ___/s/ Ross M. Zambon___
    **Ross M. Zambon**
    Attorney for Plaintiff Juraga

Ross Zambon (# 6279456)
Zambon Law Ltd.
Sulaiman Law Group, Ltd. (*of Counsel*)
Mara A. Baltabols(# 6299033)
Sulaiman Law Group, Ltd.
900 Jorie Blvd., Suite 150
Oak Brook, IL 60523
(630) 575-8181